UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,
Plaintiff,

v.                                          CRIM. NO. 25-296 (SCC)

WANDA VAZQUEZ-GARCED,
Defendant.

---

UNITED STATES' SENTENCING MEMORANDUM

The United States of America submits this sentencing memorandum for the sentencing hearing of Defendant Wanda Vazquez-Garced.

1. The United States' Sentencing Recommendation

The United States recommends that the Court sentence Defendant Wanda Vazquez-Garced to a **term of imprisonment of twelve months** and a term of supervised release and a fine deemed appropriate by the Court. A sentence of twelve months of imprisonment is appropriate given Vazquez' corrupting of the Puerto Rico gubernatorial election process by accepting foreign campaign contributions in violation of 52 U.S.C. § 30121. The serious nature of this type of political corruption and risk of harm to the public demand that a term of imprisonment be imposed. Punishment in the form of a term of incarceration promotes respect for election laws and deters others, including those running for elected offices, from engaging in corrupt behavior. That is especially true here where there was incalculable intangible harm caused to the people of Puerto Rico.

2. Guideline Calculations in the Plea Agreement

The parties agreed on the following guideline calculation in the Plea Agreement (ECF # 6):

| Sentencing Guidelines Calculations Contribution by a Foreign National (52 U.S.C. 30121) | |
|---|---|
| **Base Offense Level:** U.S.S.G. §2C1.8 | 8 |
| **Involving More than $15,000:** U.S.S.G. §2C1.8(b)(1) cross reference to §2B1.1(b)(1)(C) | 4 |
| **Involved Foreign National:** U.S.S.G. §2C1.8(b)(2)(A) | 2 |
| **Acceptance of Responsibility:** U.S.S.G. §3E1.1 | -2 |
| **Zero Point Offender Adjustment:** U.S.S.G. §4C1.1 | -2 |
| **TOTAL ADJUSTED OFFENSE LEVEL** | 10 |
| TOL 10: CHC I (6-12 months) | |

3. <u>Guideline Calculations in the Pre-sentence Report</u>

After consideration of the charge and facts related to this case, the United States Probation Office for the District of Puerto Rico determined the following guideline calculations as set forth in the Pre-sentence Investigation Report (PSR) (ECF # 10):

| Sentencing Guidelines Calculations Contribution by a Foreign National (52 U.S.C. 30121) | |
|---|---|
| **Base Offense Level:** U.S.S.G. §2C1.8 | 8 |
| **Involving More than $15,000:** U.S.S.G. §2C1.8(b)(1) cross reference to §2B1.1(b)(1)(C) | 4 |
| **Involved Foreign National:** U.S.S.G. §2C1.8(b)(2)(A) | 2 |
| **Acceptance of Responsibility:** U.S.S.G. §3E1.1 | -2 |
| **Zero Point Offender Adjustment:** U.S.S.G. §4C1.1 | -2 |
| **TOTAL ADJUSTED OFFENSE LEVEL** | 10 |
| TOL 10: CHC I (6-12 months) | |

4. <u>Summary of Facts of Criminal Conduct</u>

From March 2020 to June 2020, Defendant Wanda Vazquez-Garced, the sitting Governor of Puerto Rico, was a candidate in the New Progressive Party's primary election to select its nominee for Governor of Puerto Rico in the November 2020 general elections. Defendant Julio Herrera-Velutini, a foreign national, promised to contribute money and other things of value to support Vazquez' campaign. Defendant Vazquez-Garced accepted the political contribution for her political committee to support her candidacy, not for her personal monetary gain.

Defendant Vazquez-Garced was aware that foreign nationals could not contribute money or things of value but acted knowingly and willfully to accept the promised contributions. For purposes of the sentencing guidelines, the parties stipulated that the value of the promised contribution was more than $15,000 but did not exceed $25,000. ECF #6, p. 11.

Defendant Vazquez-Garced was motivated to accept illegal political contributions from Herrera to support her 2020 gubernatorial campaign. Herrera was motivated to make illegal political contributions to Vazquez-Garced in order to secure favor with Vazquez-Garced. This motive included ending an OCIF audit of Herrera's bank in Puerto Rico, Bancredito International Bank, and selecting Victor Rodriguez-Bonilla to serve as OCIF Director.

Herrera financially contributed to Vazquez's primary campaign by 1) hiring CT Group to conduct opinion research and paying for it directly through Britannia and 2) forming a SuperPAC to assist Vazquez's campaign, including paying consulting fees to the SuperPAC's founder and director, Dane Waters. ECF #10, PSR at ¶ 16. With regard to expenses related to the SuperPAC, Herrera and Rossini agreed that Herrera would pay Rossini's LLC, MTR Associates, from which Rossini would then pay the

SuperPAC's expenses. *Id*. By agreeing to pay, transmit, and receive illegal foreign campaign contributions, Vazquez, Herrera, and Rossini corrupted the 2020 Puerto Rico gubernatorial election.

a. <u>Factual Support for the Illegal Conduct</u>

The process by which illegal foreign campaign contributions were agreed to and then accepted are detailed through a series of electronic communications, financial records, and supported by witness statements.[1]

Defendant Vazquez admits to attending a presentation at the Vanderbilt hotel in San Juan, Puerto Rico on February 28, 2020. The purpose was to present a plan to assist her campaign and how she could prepare as a candidate. *Id*. at ¶ 50. After being reminded by her consultants and committee that the PACs against her were too much, she decided to attend. Vazquez acknowledges that attending the activity was wrong. *Id*.

Just a few days later, on March 2, 2020, Herrera ensured that Blakeman[2] knew that if Vazquez appointed Rodriguez to be Director of OCIF, it would lead to financial support for her campaign: "*With Victor we have the banks and federal regulators calmed. **This way I can dedicate time and money to her campaign*** [emphasis added]. *Tomorrow I am in San Juan and I have a call with the campaign expert from Washington then I travel to London to set up the long-term strategy.*" Less than ten minutes later, Blakeman forwarded these messages to Individual A, Vazquez' Deputy Chief of Staff. Blakeman and

---

1 For ease of reference, the following are identified herein:
Frances M. Diaz was the President and Chief Executive Officer of Bancredito International Bank.
John Blakeman was a political consultant for Vazquez-Garced during her tenure as Governor.
Individual A was Vazquez-Garced's Deputy Chief of Staff.
Individual B was Vazquez-Garced's Executive Assistant.
Individual C was an investor residing in Puerto Rico.
Individual D was an advisor to Vazquez-Garced while Governor.
CT Group was an international consulting firm engaged in political consulting.
Dane Waters was a political consultant.
2 John Blakeman pleaded guilty on March 29, 2022 to one count of conspiracy to commit bribery in violation of 18 U.S.C. §371, 666. *See* CR 22-131 (FAB).

Individual A both confirmed that they shared the substance of Herrera's message with Vazquez in person. *Id.* at ¶ 17.

On March 4, 2020, Herrera messaged Individual A, "Tomorrow I meet with JB [Blakeman] and Monday with London people Alll on track....!", to which Individual A responded "Perfect! Thanks!!" Individual A confirmed to investigators that she shared Herrera's update with Vazquez. *Id.* at ¶ 18.

On March 10, 2020, in a discussion about payment of Rossini's consulting fees, Rossini messaged Herrera, "best to send funds to my LLC." Herrera asked Rossini if he believed the "Same Formula" was also necessary for "the research of CT," and expressed his belief that he could "pay this directly" using "Britannia Financial Services Limited, Registered address: 11/F, Capital Centre, 151 Gloucester Road, Wanchai, Hong Kong." Confirming the agreement between CT Group and Herrera that Herrera could personally retain CT Group for opinion research without running afoul of U.S. law, Rossini, a non-attorney, replied, "Yes. That you can. No problem," then, "I was just thinking more for when I go to create the Super PAC and hire the DC lawyers I'll need funds from MTR Associates to do that." Rossini's response that they would have to filter Herrera's money through Rossini's LLC when they hired "DC lawyers" suggests that he knew the law well enough to recommend obscuring Herrera's financing of domestic expenditures. *Id.* at ¶ 19.

On March 13, 2020, Herrera messaged Individual C to "ask about ocif and our candidate." He then put a finer point on it: "BTW: I am taking [sic] about Fortaleza." Herrera then repeated that he was going "to Washington this week to setup everything for her." Again, the same day, he implored Individual C to, "Please talk to her !!!" Herrera then noted his own secrecy: ***"I am running a silent campaign and pac on the side."*** *Id.* at ¶ 20 (*emphasis added*).

Financial records show that on March 16, 2020, Rossini paid $15,000 to a law firm for "Legal Services Related to Spac" (a reference to the SuperPAC) from his LLC's bank account. On March 27,

2020, less than two weeks later, Herrera reimbursed Rossini by transferring $25,000 to MTR's account from a Barclay's account held by Britannia. *Id*. at ¶ 21.

Dane Waters was recruited by CT Group to run Herrera's pro-Vazquez SuperPAC. CT Group told Waters that Rossini was a "middleman" who would be representing the interests of the "client," which Waters understood to be Herrera and Individual C. Waters was told that Herrera and Individual C wanted to set up a PAC in Puerto Rico to support a gubernatorial candidate. Waters suggested that they instead use a federal SuperPAC. Waters became the campaign lead and soon thereafter had a conference call with Herrera and Individual C to discuss the campaign. Waters did not believe that Herrera and Individual C had yet decided whether to support Vazquez or Pierluisi; rather, the "big thing" for them was who the "banking commissioner" would be. He noted that Herrera and Individual C were "the money people," and that he was to be paid by Rossini, who would be reimbursed by Herrera. *Id*. at ¶ 22.

On March 20, 2020, Herrera reminded Individual C of the work "on the project of W" (referring to Vazquez), then, a few minutes later, "BTW: They never call Victor." Three days later, Individual C told Herrera that he just "called the governor" and "reminded her to call victor." Individual C told Herrera that Vazquez "said okay." Individual C then clarified that he had spoken to Vazquez "direct" and not to "Lillian [Sanchez]." Individual C reassured Herrera, "They say today they will call victor and they promised." *Id*. at ¶ 23.

On March 24, 2020, Rossini messaged Herrera that he "[j]ust had a nice talk with D Waters. He has some great ideas," that "[h]is fee is $17500 a month and he would need his accommodations on top of that. So somewhere around $19k total. He requires a month in advance." Rossini further informed Herrera that "MTR LLC [Rossini's firm] would have to pay him to get things going and once the PAC is established and the funds start to arrive then the PAC would pay him." The next day, March 25, Rossini followed up with Herrera for his thoughts on Waters's price, and Herrera responded, "I am fine" but

asked that Rossini get "the green light from Blakeman." Blakeman, at this time, was continuing to advise Vazquez on her election campaign and serve as an intermediary between Herrera and Vazquez's camp. When Rossini asked who of the two should contact Blakeman, Herrera –in a nod to the necessity to maintain the facade of his noninvolvement– responded, "Better to come from you." Later the same day, Rossini confirmed Blakeman's approval: "He's on board. Needs our armies help. He knows in one day W can lose all she has gained." Herrera responded, "Confirmado [*Confirmed*]," then asked, "you talk to him?" Rossini replied, "Yes." Herrera then green-lighted Rossini, messaging, "Go," followed by a check-mark emoji, to which Rossini replied, "On it!" *Id.* at ¶ 24.

With regard to the SuperPAC, on March 30, 2020, Herrera ensured that Vazquez' team knew that he hired Waters to run it. Herrera, referencing Waters, asked Rossini, "Can we ask for a CV so we know who he is?" Herrera subsequently sent Individual C an attachment via WhatsApp Messenger titled, "MDW Political BIO bullets.pdf.pdf.pdf." The attachment contained a C.V. for Waters. Immediately after sending the attachment, Herrera wrote, "Super PAC political coordinator!" The same day, Individual C sent directly to Vazquez via WhatsApp Waters' C.V. (with the same filename as the C.V. that Herrera sent Individual C) and a message, "Super Pac coordinator." *Id.* at ¶ 25.

In April, Waters got to work. He registered the SuperPAC with the Federal Election Commission ("FEC"). On April 8, 2020, a Statement of Organization was filed for Prosperity Now PAC with the FEC. The name was subsequently amended on April 14, 2020, to Prosperity Through Leadership PAC ("PTLPAC"). On April 15, 2020, Waters caused a 501(c)(4) domestic nonprofit corporation named Prosperity Through Leadership, Inc. ("PTL Inc.") to be registered with the State of Ohio, Secretary of State. PTL Inc. would effectively supplement the efforts to PTLPAC to influence the 2020 Puerto Rico gubernatorial election. *Id.* at ¶ 26.

Then, on April 16, 2020, days after Waters had officially registered PTLPAC, Individual C messaged Individual A, "Super pac. Ready," right after sending her the link for the PAC's website. Individual C also messaged Vazquez herself the link, followed by, "this is the super pac governor. It's created in DC. Ready." Two days later, Herrera sent Blakeman documents regarding PTLPAC, including wiring instructions, then messaged, "Ready when you are." When Blakeman responded that he was "on his way," Herrera messaged, "Superpac ready" and "*The question if she will need us or is no longer interested for x or y [reason]*" (emphasis added). *Id.* at ¶ 27.

According to Blakeman, Vazquez unquestionably needed the financial support—with the COVID-19 pandemic fully underway in April 2020, Vazquez was unable to actively campaign and fundraise, just as her primary challenger, Pierluisi, was waging a withering media campaign against her. And according to Individual A and Individual B, Vazquez frequently asked them during meetings at Fortaleza: "What is going on with the PAC?" *Id.* at ¶ 27.

Waters informed investigators that while he envisioned using the PAC for future political campaigns, he established it in April 2020 for the purpose of supporting Vazquez's 2020 gubernatorial campaign. *Id.* at ¶ 15. The same day Waters created Prosperity Now PAC, Rossini messaged Herrera that he would be on a conference call with CT Group and Rossini estimated the budget would be in the range of $570,000. *Id.* at ¶ 28.

Rossini also dealt with the payment of Waters, informing Herrera on March 30, 2020 that he had been invoiced by Waters: "Hola. Here is the invoice of Dane." The invoice was for $38,000, broken up into a $17,500 "April Consulting Fee," a $17,500 "May Consulting Fee," and $3,000 for "April Accommodations and Expenses." Rossini followed up with Herrera on April 10, writing: "I haven't had any wire come in to pay Dane and the filing fees etc. I know it's been a crazy week and it's a bank holiday in the UK." Herrera responded, "I will talk to my bank monday." Herrera then clarified that he

would be sending "40K," to which Rossini replied, "Ok. That will cover Dane and fees for filing etc. great." *Id*. at ¶ 28.

According to records obtained from JP Morgan Chase, on, April 14, 2020, Rossini transferred $40,000 to Waters' bank account at PNC Bank from a bank account for MTR Associates. The description for the transfer read, "For Political Research And [sic] Related Activities on Pac." Three days later, on April 17, 2020, a $50,000 wire transfer from Britannia Global Investments was credited to the same MTR Associates bank account at JP Morgan Chase. Herrera paid Waters's first bill for consulting services using his Britannia account by funneling the funds through MTR Associates. *Id*. at ¶ 28.

With regard to the work being done by CT Group and Dane Waters to benefit Vazquez' campaign, the firm completed polling and opinion research on the election in early April. The work product, called "Project Hirst Focus Group Report," was 14 pages long and summarized "twenty mini focus groups [ ] conducted online with voters from San Juan, Carolina, Ponce, Arecibo, and Caguas," including PNP or PPD supporters. CT Group produced the report to Rossini via email on April 8, 2020. Rossini shared the report with Blakeman, who shared it with Individual A, Individual B, and Individual D via Telegram. In his message to Vazquez's team, Blakeman wrote that they should "look at it closely," as the report contains their next steps in the upcoming months. The following day, Blakeman sent a message to the same Telegram group, asking if anyone had read the report. Individual D responded, "On it." Moreover, Individual C shared the report directly with Vazquez, writing that the "first survey is in." Vazquez responded that she read the documents and that "they look[ed] pretty good." She then lamented how hard the race against Pierluisi would be due to his media support. Individual C forwarded her message to Herrera the same day, and Herrera responded, "She needs help." Individual C then asked Herrera if "we should do a facetime meeting with her and u and ct and then u and her speak?" Herrera responded that he preferred "she talks to CT and Mark Rossini" because "Mark is controlling the show."

Individual C then informed Vazquez, via text message, that "Mark" would contact her regarding setting up a video call "to share research and next steps." *Id*. at ¶ 29-30.

Then, at the end of April, CT Group completed a 57-page report of polling data. This, too, made it to Vazquez's camp – Herrera sent it to Individual C via email on April 28, 2020, and Blakeman sent it to Rodriguez on May 4, 2020. According to CT Group, while their opinion research was not geared towards any particular candidate, the results of the research would undoubtedly be valuable to any campaign; their polling explored voters' inclinations, perceptions, and priorities, and any candidate could use such insights to tailor their campaign strategy and messaging.[3]

On May 6, 2020, after Herrera had already paid $50,000 towards Dane Waters' services and £263,000 to CT Group, he sent Rossini a message over WhatsApp Messenger that read, "She does not play ball with us !!!!" In response, Rossini wrote, "She better by tomorrow," then continued, "Hopefully [Individual C] can meet her." Rossini concluded by telling Herrera that he would send Blakeman "what I sent yesterday." Rossini then sent Blakeman a veiled message over WhatsApp Messenger that read, in part, "Hi John. When you meet with your friend please advise her (and you know this already) that the people behind the PAC want an affirmation from her that she is determined to win this election." Rossini then wrote to Blakeman, "The PAC will kick into gear and publicly she can see the PAC's actions and follow through and expand upon it." Blakeman responded, "I'm on my way to Fortaleza." Rossini then sent Herrera a message over WhatsApp Messenger that read, "John is seeing her at 5 pm. I've been in touch with John over the last hour. He is aware." According to Blakeman, he personally conveyed Herrera and Rossini's message to Vazquez. Blakeman testified that it was clear to him and Vazquez that

---

3  Vazquez admitted that she received CT Group work product paid for by Herrera. ECF 887, p. 14, FN 3 ("…Individual C sent a summary of the survey to Governor Vazquez.").

the SuperPAC would not "kick into gear" until Vazquez appointed Rodriguez as OCIF Commissioner. *Id*. at ¶ 31.

On May 7, 2020, the day after the above-described conversations between Rossini, Blakeman, and Herrera, Rossini asked Blakeman, "How did your meeting go." Blakeman responded, "It was a great meeting. This morning they ask me for the number of the proposed new director of OCIF. (What Julio needed)." Rossini replied to Blakeman, "Oh fantastic," then proceeded to tell Herrera, ***"I understand from JB [Blakeman] that the message was delivered loud and clear and his amiga is on board"*** (emphasis added). In response, Herrera told Rossini, "Let's see if is true!" The same day, Rossini made sure that Blakeman knew that the SuperPAC would become operational in exchange for Herrera's pick for OCIF Commissioner being installed. Rossini messaged Blakeman, opaquely referencing Herrera and directly referencing what Vazquez would receive in return for the Rodriguez appointment: ***"Hi John: I just spoke to a mutual friend whom [sic] advised that if/when that gentleman is installed as the OCIF director that with [sic] 72 hours the 'switch will be turned on' and the PAC will be on the island and forging ahead"*** (emphasis added). Rossini then sent that same message to Herrera with the explanation, "What I sent." *Id*. at ¶ 32.

Blakeman confirmed that Vazquez was aware that in exchange for appointing Rodriguez, Vazquez would continue to get financial support via Mr. Herrera.  Similarly, Individual A confirmed that it was clear to Vazquez that Herrera offered financial support for Vazquez' campaign. *Id*. at ¶ 33.

On May 12, 2020, Rossini messaged Blakeman and asked, "if the advice provided has been implemented," to which Blakeman responded, "they are implementing the recommendations" and "The guy for OCIF went to Fortaleza and was interviewed." In response, Rossini wrote, "Great!!!!" He then proceeded to forward Blakeman's message to Herrera and opined, "She gets it now." In response,

Herrera wrote, "They are moving but very slowly." Rossini agreed stating, "They take 'mañana' to a whole new level." *Id*. at ¶ 34.

In fact, Rodriguez was not interviewed. Rather, at Vazquez' direction, Individual A called Rodriguez and officially offered him the position, and Rodriguez accepted. On May 14, 2020 Vazquez announced the appointment of Rodriguez as the new Commissioner of OCIF. That evening, Rossini, apparently unaware of the announcement, again checked in with Blakeman on whether Rodriguez had been appointed, and again, directly tied Dane Waters's help with the campaign to the appointment of Rodriguez: "Hi John. Just checking in again. The PAC gent is waiting to get there. Hope your friend is following through on the recommendations… gracias." Blakeman's immediate response was to send Rossini a copy of the official announcement of Rodriguez's appointment. Eight minutes earlier, Blakeman sent the same announcement to Herrera. *Id*. at ¶ 35.

At 9:33 pm, one minute after receiving the announcement from Blakeman, Rossini forwarded it to Herrera. In response, with Rodriguez's appointment finally secured, Herrera texted Rossini the following instructions: "Prepare Dane [checkmark emoji]" and "Looks like we are playing balls [soccer ball emoji]." Rossini also updated CT Group that it was time to move forward with the SuperPAC, messaging a CT Group partner: "Hi. Sorry for the late hour. Just got word to 'prepare Dane'. Talk tomorrow." In response, the CT Group partner asked, "Prepare for take off?" Rossini immediately replied, "Buckle your seatbelts." *Id*. at ¶ 36.

On May 16, 2020, Individual C congratulated Herrera on Rodriguez's appointment and said, "Finally u have power here sir." Individual C then informed Herrera that Rodriguez would be confirmed by the Puerto Rico Senate "as soon as senate is in session." In response, Herrera wrote, "amen" then suggested he and Individual C "keep it very ND." Individual C then opined that power "wont [sic] last" unless it is "always silent." *Id*. at ¶ 37.

On Thursday, May 21, 2020, Waters flew to San Juan from Florida, where he had been holed up while awaiting orders from Herrera and Rossini to travel to the island. The following morning, Waters met with Blakeman at the La Concha hotel where they discussed the strategy for the SuperPAC. Approximately two weeks later, Waters met with Vazquez in person at her office, where they discussed her vision for Puerto Rico, why she wanted to run for election, and things she could do to better position her campaign. *Id*. at ¶ 38.

During this time, Herrera continued to pay for Waters's consulting services and travel expenses, through Rossini. On May 12 and June 2, 2020, Rossini paid Waters $5,000 and $34,246.51, respectively. On June 2, Rossini also received $45,000 from Britannia Global Investments, a Herrera-controlled entity. Then, on June 24, 2020, Rossini sent Herrera a WhatsApp message that read, "25K no problem for D." In response, Herrera wrote, "Done," followed by a check mark emoji. Rossini then told Herrera he would "pay now," because, "I told him already I would pay it." That same day, Rossini transferred $25,000 to Waters' bank account from MTR Associates' account. The description read, "For Political Research And [sic] Related Activities On Pac." The following day, a $45,000 wire transfer from Britannia Global Investments was credited to the same MTR Associates bank account, effectively reimbursing Rossini. *Id*. at ¶ 39.

5.  <u>Summary of Background of Defendant</u>

Vazquez is retired after 38 years in various positions in public service. After obtaining her law degree and becoming licensed by the Supreme Court of Puerto Rico to practice law in Puerto Rico, Vazquez served as an attorney in the legal division of the Puerto Rico Department of Housing, as a prosecutor for the Puerto Rico Department of Justice, as the Woman's Advocate (Procuradora de la Mujer), the Puerto Rico Secretary of Justice, and the unelected Governor of Puerto Rico.

Vazquez reports a healthy childhood upbringing with respect, morals, and values instilled by both parents. ECF # 10 at ¶ 72. Vazquez has the benefit of an excellent education, a loving family, and a comfortable economic situation. *Id*. at ¶ 71-102.

Given her legal background, including that as Secretary of Justice, Vazquez has a firm understanding of the law and the importance of law enforcement. Despite her upbringing, education, and professional achievement, Vazquez intentionally made the calculated decision to violate federal election laws and accept foreign campaign contributions from Herrera.

6.  Sentencing Procedure, 18 U.S.C. § 3553 Factors

A.  Legal Framework

District courts should follow a standard procedure when sentencing defendants. That standard was set forth in *Gall v. United States*, 552 U.S. 38 (2007). According to that precedent, the district court's "starting point" is to determine the advisory sentencing range under the Guidelines. *Id.* at 49. That includes resolving any objections to the presentence report. *United States v. Laureano-Perez*, 797 F.3d 45, 80 (1st Cir. 2015). The parties then present their arguments on what they believe is the appropriate sentence. *Gall*, 552 U.S. at 49. After that, the district court must weigh the factors in section 3553(a) to determine whether they support the sentences requested by the parties. *Id.* A district court errs in performing this procedure by treating the Guidelines as obligatory rather than advisory, *id.* at 51, or presumptively reasonable, *United States v. Nelson*, 555 U.S. 350, 352 (2009) (per curiam). The district court is required to provide an explanation for the sentence it determines is appropriate; that allows for meaningful appellate review and promotes the perception of fair sentencing. *Gall*, 552 U.S. at 50.

Pursuant to 18 U.S.C. § 3553(a), a sentencing court must consider the following factors when imposing a sentence:

(1) the nature and circumstances of the offense and the history and characteristics of the

defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established ...

(5) any pertinent policy statement—

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

In weighing the factors under § 3553 and making our recommendation to the Court, the United States submits that a sentence of <u>twelve months of imprisonment</u> is reasonable and well-supported by the various §3553(a) factors. A sentence of twelve months of imprisonment would punish Vazquez for corrupting the election process, deter others from committing similar offenses, and help to preserve the public trust.

B.  <u>Nature and Circumstances of the Offense</u>

First, the nature and circumstances of Defendant's offense require a serious and meaningful term of incarceration. As described in detail in the PSR and in this memorandum, Defendant undermined the integrity of an island-wide primary election for governor by illegally agreeing and accepting to receive

illegal foreign campaign contributions. In doing so, she subverted the Federal Election Campaign Act, 52 U.S.C. § 30101, et seq., by engaging in a scheme to illegally obtain political campaign contributions from Julio Herrera-Velutini. The harm here is substantial. Defendant Vazquez-Garced's illegal political scheme undermined the faith of the people of Puerto Rico in the transparency of their electoral process.

Under the circumstances of this offense, a straightforward application of the relevant guideline, U.S. Sentencing Guideline § 2C1.8, also appropriately comports with both Congress' directives concerning this guideline, as well as the U.S. Sentencing Commission's amendment promulgating the guideline. In the Bipartisan Campaign Reform Act of 2002, Congress specifically directed that the U.S. Sentencing Commission promulgate a new guideline or amend an existing guideline "for penalties for violations of the Federal Election Campaign Act of 1971 and related elections laws," taking into account the "serious nature of such violations and the need for aggressive and appropriate law enforcement action to prevent such violations." Pub. L. No. 107-155, § 314 (2002) (emphasis added). Soon afterward, the Sentencing Commission promulgated Amendment 648, which first introduced U.S. Sentencing Guideline § 2C1.8. In explaining the basis for creating U.S. Sentencing Guideline § 2C1.8, the Commission explained that campaign finance crimes "are more serious [than traditional fraud schemes] due to the additional harm, or the potential harm, of corrupting the elective process." U.S. Sentencing Commission, Amendment 648, Reason for Amendment.

With respect to foreign campaign contributions, the federal ban acts as a barrier against foreign influence in elections and serves to strengthen the American public's faith in the electoral process as a whole. After all, foreign election interference, by an individual or a foreign government, is a threat to national security and foreign policy. That is precisely why all foreign campaign contributions are illegal in connection with any "Federal, State, or local election." 52 U.S.C. § 30121(a). Importantly, §

30121(a)(1) bars only foreign nationals from making donations and contributions and does not reach the actions of American citizens or permanent residents.

A high-end-of-the-guidelines sentence would respect Congress's recognition of the "serious nature of [FECA] violations" as well as the Sentencing Commission's determination that FECA offenses merit special treatment because they "corrupt[] the elective process."

Not only did Vazquez corrupt the election process by receiving illegal foreign contributions, but she opened herself up to be corrupted by a Venezuelan banker looking to get a new chief regulator at OCIF. As evidenced by the various electronic communications, Herrera was extremely motivated to support Vazquez so as to get action taken at OCIF. Rather than refuse foreign campaign contributions from Herrera, Vazquez agreed and accepted his illegal participation, carried out via clandestine, secret, layered transactions, all designed to hide the truth from the voting public. This represents a blatant and fundamental breach of the public's trust. A breach that Vaquez perpetrated while sitting as Governor of Puerto Rico.

Vazquez' illegal campaign contribution scheme further eroded the public's trust in elected officials and has contributed to making it more difficult for the public to trust in the election process. Further, Vazquez' conduct created an unfair playing field as she engaged in illicit activities to further her political ambitions.

C. Need to Reflect the Seriousness of the Offense

The Court should fashion a sentence here that accounts for the seriousness of an offense that, by its very nature, undermines faith among citizens in the transparency of their electoral process and the accountability of their government officials. Given Defendant's substantial role as a public official actively engaged in a candidacy for Governor of Puerto Rico, a meaningful sentence is necessary to promote respect for the law and provide just punishment commensurate with the harm occasioned by

Defendant's illegal foreign contribution scheme.

A sentence of imprisonment is appropriate and deserved. Said punishment would be proportional to the significant breach of public trust perpetrated by Vazquez in corrupting the 2020 gubernatorial election process. There are few non-violent crimes that impact the public more than election crimes. And no election in Puerto Rico is more important that the island-wide selection of the Governor of Puerto Rico. A sentence of imprisonment holds Vazquez responsible for the social harm she caused. A non-prison sentence could undermine the public's trust in the justice system and convey that election crimes are not serious.

   D.   Need to Afford Adequate Deterrence to Criminal Conduct

The sentence imposed should not only reflect the seriousness of the offense, but it should afford adequate deterrence to future criminal conduct. The need for specific deterrence here because the Defendant appears to not recognize the gravity of her conduct.

On August 27, 2025, immediately after pleading guilty to receiving illegal foreign campaign contributions from a Venezuelan banker seeking to change Puerto Rico's chief financial regulator, Vazquez made public comments to the press outside the courthouse. *See*

https://www.telemundopr.com/historias-destacadas/wanda-vazquez-se-declarara-culpable-en-el-tribunal-federal/2743939/ ; Exhibit 1, Transcript of 8/7/25 Statements.

She immediately attempted to blame others in her political campaign stating, "…I really, entrusted it to some people who I had around me who had the responsibility, right, of, of verifying things. They did not do it, and I am here, accepting the responsibility because, well, I was the president of the party, I was the candidate." Exhibit 1 at p. 1; *see also* p. 4 ("I focused on the administration of the government, and, I trusted, um, all of that political process, to some people whom I had around me, right, who did not do their job well and I am here assuming the responsibility. It is my responsibility.").

These public statements shifting blame are at odds with the truth, genuine acceptance of responsibility, remorse, and her subsequent acknowledgement to the United States Probation Office when she admitted: "It was an offer, and I accepted it." ECF # 10, ¶ 49. "It was my error. *Id.*

Vazquez herself knowingly accepted illegal foreign campaign contributions from Herrera, a Venezuelan banker motivated to obtain change at OCIF. Still, Vazquez publicly disclaimed that the illegal campaign contribution had anything to do with the administration of the Puerto Rico government, completely ignoring a) Herrera's motive to make the illegal foreign campaign contributions and b) Vazquez' own action in replacing the OCIF director. Exhibit 1 at p. 1-2 ("It has nothing to do with me as governor, but rather, if you heard the stipulation, and you heard the crime, it is a crime as a candidate, to a political position. It has nothing to do with my administration of the government, right. I believe this is very important.")

Any sentence here should ensure that Defendant comprehends the significance of her conduct, punishes Vazquez based on the seriousness of that illegal conduct, and deters others from similar conduct.

General deterrence here is perhaps a more dominant concern under § 3553(a)(2)(B). Courts have recognized that "[d]eterrence is a crucial factor in sentencing decisions for economic and public corruption crimes." *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015); *see also, e.g., United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (describing "economic and fraud-based crimes a[s] more rational, cool, and calculated than sudden crimes of passion or opportunity" and, therefore, "prime candidates for general deterrence") (alteration, citation, and internal quotation marks omitted). Specifically, the sentence should make clear that those who abuse their positions of trust will face serious consequences. For instance, "one of the primary objectives of sentencing elected officials convicted of bribery is to send a message to other public officials that bribery is a serious crime that

carries with it a correspondingly serious punishment." *Morgan*, 635 F. App'x at 450-51 (alterations, citation, and internal quotation marks omitted); *see also United States v. Spano*, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006) (explaining that it is necessary "to impose strict penalties on all defendants who engage in [public corruption]").

The need for general deterrence is particularly important in cases such as this one, which erode public confidence in our institutions and are notoriously difficult for law enforcement to detect. *See*, e.g., *United States v. Sorenson*, 233 F. Supp. 3d 690, 699 (S.D. Iowa 2017) ("Sentencing corrupt office holders to a colloquial 'slap on the wrist' may over time exacerbate an endemic cycle of corruption."); *Spano*, 411 F. Supp. 2d at 940 (recognizing that public corruption crimes "undermine[] the essential confidence in our democracy and must be deterred if our country . . . is ever to achieve the point where the rule of law applies to all—not only to the average citizen, but to all elected and appointed officials").

1. 2020 Gubernatorial Election in Puerto Rico

The need for general deterrence is particularly startling when considering that another illegal campaign finance scheme was committed by Joseph Fuentes-Fernandez in Puerto Rico at the same time as Vazquez' illegal foreign campaign contribution scheme.

From March 2020 to November 2020, Joseph Fuentes-Fernandez was the president of a SuperPAC, Salvemos a Puerto Rico (Salvemos), which he operated primarily to support the 2020 election of Public Official-1[4], a candidate for Governor of Puerto Rico in 2020. *See* CR 22-182(JL). Fuentes and Salvemos falsely listed the names of non-profit corporate straw donors rather than the identity of the true sources of political donations. As a result, Fuentes and Salvemos hid the true identities of political donors that contributed approximately $220,000 to the Salvemos a Puerto Rico Super PAC in support of Public Official-1's candidacy for the 2020 Puerto Rico Governor's seat.

---

[4] Public Official-1 is not Vaquez-Garced.

Similarly, from August 2020 to October 2020, Herrera also caused $75,000 to be contributed to Salvemos to support the same gubernatorial candidate in Puerto Rico (Public Official-1). Salvemos reported a $25,000 contribution from Bancredito Holding on August 10, 2021 and a $50,000 contribution from Bancredito Holding on October 21, 2020. *See* https://www.fec.gov/data/receipts/?data_type=processed&committee_id=C00746594&contributor_name=bancredito

Herrera also caused a $50,000 contribution to be made to Puerto Rico Mejor Futuro (Futuro), a Super PAC supporting a third 2020 gubernatorial candidate in Puerto Rico. Futuro reported to the FEC that a $50,000 contribution was made by Bancredito Holding Corporation on October 21, 2020.

Fuentes and Salvemos were convicted of making false statements in a report to the Federal Election Commission (FEC) in violation of 18 U.S.C. §1001(a)(1). Fuentes was sentenced to a term of **14 months of imprisonment**, while Salvemos was sentenced to probation and a $150,000 fine. *See* CR 22-182(JL), ECF # 48, 49. The conduct in the *Fuentes* case overlapped with the conduct at issue in the Vazquez case and also involved campaign fundraising for the election of the Governor of Puerto Rico.

Fuentes, Vazquez, and Vazquez' co-defendants subverted the United States election campaign laws to illegally funnel money into gubernatorial campaigns in Puerto Rico without disclosing the true identity of the donors. In doing so, Fuentes, Vazquez, and Vazquez' co-defendants deprived the citizens of Puerto Rico of a transparent electoral process. As the Court can see, during the 2020 gubernatorial election cycle in Puerto Rico, multiple criminals engaged in various schemes to hide, disguise, and make illegal campaign contributions to three candidates for governor. The sentence in this case must deter others from taking similar action in the future.

This need for deterrence is heighted because, "[t]he public is also harmed '[w]hen trust in our institutions is low' due to 'the corrosive influence of money in our politics' because that lack of trust has

become an integral part of a political climate that is 'so corrosive that people of good character aren't even willing to enter into public service." *Sorrenson*, 233 F.Supp. at 700 *quoting* Barack Obama, *Farewell Address* (Jan. 10, 2017).

 2.  Similar Historic Violations

Similar schemes have impacted other elections in Puerto Rico and elsewhere. For example, during the 2016 gubernatorial election cycle, Herrera caused a total of $100,000 in contributions to be made via Bancredito International Bank to Integridad y Experienecia para el Cambio (Integridad), a SuperPAC which principally supported a fourth gubernatorial candidate in Puerto Rico. Integridad reported to the Federal Election Commission that a $50,000 donation was received on October 28, 2016 and another $50,000 was received on November 4, 2016. *See* https://www.fec.gov/data/receipts/?data_type=processed&committee_id=C00624577&contributor_name=bancredito

Nicolas Sarkozy, the former president of France, was recently found guilty of conspiring to finance his 2007 election bid with help from the government of Libya and Col. Muammar el-Qaddafi. Sarkozy was reportedly sentenced to a five-year prison term. *See generally* https://www.nytimes.com/2025/09/25/world/europe/sarkozy-france-prison-libya-qaddafi.html

In April 2023, Prakazrel "Pras" Michel was convicted at trial for his involvement in a conduit contribution, witness tampering, and foreign lobbying scheme. The 2012 conduit contribution scheme involved Michel funneling illegal foreign campaign contributions from a Malaysian national into the election for the Office of the President of the United States. Knowing that foreign contributions were illegal, Michel willfully helped to funnel money through a network of straw donors and causing false statements to the FEC. *See United States v. Michel*, 2024 WL 1603362 (D.D.C. 2024). Michel's sentencing is pending.

In February 2023, Jesse Benton, a political consultant from Texas, was sentenced to 18 months in prison for his role in funneling political contributions from a Russian national to a 2016 presidential campaign. *See generally United States v. Benton*, 98 F.4th 1119 (D.C. Cir. 2024). Benton, concealing the identity and nationality of the true donor, caused the Russian national to wire $100,000 to Benton's political consulting firm to then make the illegal foreign contribution to the presidential campaign. To disguise the scheme, Benton created a fake invoice, which falsely identified the funds as payment for consulting services. Benton then contributed $25,000 in his own name as a straw donor and kept the remaining $75,000.

These cases provide concrete examples of foreign actors from Libya, Venezuela, Malaysia, and Russia who attempted to gain access and action from heads of state through illegal foreign contributions. Similar to the case of Vazquez, these offenses demonstrate the dangerous potential for foreign contributions to inject foreign interests into our domestic public officials' decision-making, compromising our national security and domestic and foreign policies. *See United States v. Singh*, 979 F.3d 697, 710 (2d Cir. 2020) (rejecting a constitutional challenge to the foreign contribution prohibition and noting that "Congress has made a judgment on a matter of foreign affairs and national security by barring foreign nationals from contributing to our election processes.").

### 3.  Corruption in Puerto Rico

Vazquez has admitted to receiving illegal campaign contributions from a foreign source and effectively hiding from the Puerto Rico people the transparency needed to ensure fair elections. This violation alone merits aggressive and significant punishment, even prior to considering any malicious motives of her foreign donor, Herrera.

The illegal activity of Vazquez and breach of public trust did not occur in a vacuum. Unfortunately, public corruption in Puerto Rico has posed a significant threat in recent history. Over the

last ten years, approximately 87 individuals have been sentenced in the District of Puerto Rico based on

federal bribery and corruption charges. The chart below reflects this total on a per-year basis.



*See* USSC Interactive Data Analyzer, available at: https://ida.ussc.gov/analytics/saw.dll?Dashboard

This represents 2.6% of federal public corruption sentencings in the United States. This is a disproportionate rate, since the Puerto Rico population is approximately 1% of the total United States population.[7]

In the last five years, numerous <u>elected</u> officials have been prosecuted and convicted in high-profile public corruption schemes. *See United States v. Maria Milagros Charbonier-Laureano*, CR 20-248 (SCC) (Puerto Rico Representative sentenced to 96 months in prison in kickback scheme to steal over $95,000 in public funds); *United States v. Nestor Alonso-Vega*, CR 20-371(RAM) (Puerto Rico Representative sentenced to 60 months in prison in employee kickback scheme); *United States v. Angel Perez-Otero*, CR 21-474(ADC) (Mayor of Guaynabo sentenced to 63 months in prison involving municipal contract bribery scheme); *United States v. Félix Delgado-Montalvo*, CR 21-463 (RAM) (Mayor of Cataño sentenced to 12 months in prison in bribery conspiracy involving municipal contracts); *United States v. Luis Arroyo-Chiques*, CR 21-485 (SCC) (Former mayor of Aguas Buenas sentenced to 24 months in prison in bribery conspiracy involving municipal contracts); *United States v. Eduardo Cintron-Suarez*, CR 22-151 (SCC) (Mayor of Guayama sentenced to 30 months in prison in bribery conspiracy involving municipal contracts); *United States v. Javier Garcia-Perez*, CR 22-185 (ADC) (Mayor of Aguas Buenas sentenced to 37 months in prison in bribery conspiracy involving municipal contracts); *United States v. Reinaldo Vargas-Rodriguez*, CR 22-186 (PAD) (Mayor of Humacao sentenced to 37 months in prison in bribery conspiracy involving municipal contracts); *United States v. Jose Cruz-Cruz*, CR 22-276 (SCC) (Mayor of Trujillo Alto sentenced to 24 months in prison in bribery conspiracy involving municipal contracts).

---

[7] The 2020 U.S. Census reported a United States population of 331,449,281 while the population of Puerto Rico was 3,285,874.

As the United States noted in the case of *Charbonier-Laureano*, "[o]ther would-be corrupt officeholders in Puerto Rico are watching these sentencing proceedings." *See* CR 20-248(SCC); ECF 703, p. 29. A non-custodial sentence would not serve to deter future criminal conduct among public officials or those, both foreign and domestic, that seek to curry favor and corrupt officials at all levels of the Puerto Rico government.

Over the last five years, statistics from the United States Sentencing Commission reflect that twenty-six individuals have been sentenced pursuant to § 2C1.8. These cases come from 14 different districts, including Puerto Rico. Of those twenty-six individuals sentenced under §2C1.8, a total of fifteen (15) – or 57% -- received prison sentences. The average length of the prison sentences was 20 months of imprisonment while the median was 15 months of imprisonment.



**Sentence Type for Sentenced Individuals**
Fiscal Year 2020,2021,2022,2023,2024

Probation and Alternatives 11.5%

Prison Only 57.7%

Probation Only 30.8%

The figure includes the 26 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure.
Alternatives include all cases in which individuals received conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2020,2021,2022,2023,2024; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2C1.8; Drug Type: All; Sentencing Zone: All; Criminal History: All; Career Offender Status: All



**Average and Median Imprisonment Length**
Fiscal Year 2020,2021,2022,2023,2024

The figure includes the 15 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2020,2021,2022,2023,2024; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2C1.8; Drug Type: All; Sentencing Zone: All; Criminal History: All; Career Offender Status: All

*See* USSC Interactive Data Analyzer, available at: https://ida.ussc.gov/analytics/saw.dll?Dashboard

A sentence of twelve months of imprisonment is consistent with the U.S.S.G. Calculations, the §3553(a) factors, including the seriousness of the offense and need for deterrence, and similar cases throughout the United States.

7. <u>Conclusion</u>

The serious nature of this type of political corruption and harm to the public and integrity of the electoral process warrant the imposition of a term of imprisonment. Punishment in the form of a term of incarceration promotes respect for election laws and deters others, including those running for elected offices, from engaging in corrupt behavior. That is especially true here where there was incalculable intangible harm caused to the people of Puerto Rico. For these reasons, the United States submit that the recommended **<u>sentence of twelve months of imprisonment</u>** is just and reasonable.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 6th day of October 2025.

W. Stephen Muldrow
United States Attorney

_ s/ Seth A. Erbe_____
Seth A. Erbe - 220807
Assistant U.S. Attorney
United States Attorney's Office
Torre Chardón, Suite 1201
350 Carlos Chardón Ave.
San Juan, PR 00918
Tel. (787) 766-5656
seth.a.erbe@usdoj.gov


*s/ Myriam Y. Fernandez-Gonzalez*
Myriam Y. Fernandez-Gonzalez - 218011
Assistant U.S. Attorney
Torre Chardón, Suite 1201,
350 Carlos Chardón Street
San Juan, Puerto Rico 00918
Office: 787-766-5656
myriam.y.fernandez@usdoj.gov


CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this same date, this motion was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to defense counsel.

*S/ Seth A. Erbe*